**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CYNTHIA R. HEBERT,** *Individually;* | § | **PLAINTIFF** |
| *and as the Personal Representative and* | § | |
| *Mother of Christopher Allen Hebert,* | § | |
| *Deceased; and on Behalf of His* | § | |
| *Rightful Beneficiaries at Law* | § | |
| | § | |
| **v.** | § | **Civil No. 1:13cv107-HSO-RHW** |
| | § | |
| **OMEGA PROTEIN, INC.,** *et al.* | § | **DEFENDANTS** |

**MEMORANDUM OPINION AND ORDER DENYING IN PART
AND FINDING MOOT IN PART PLAINTIFF'S [99] MOTION
TO STRIKE; GRANTING DEFENDANT'S [81] MOTION FOR SUMMARY
JUDGMENT; FINDING MOOT DEFENDANT'S [89] MOTION
TO EXCLUDE OR LIMIT FORENSIC DOCUMENT EXAMINATION
REPORT AND TESTIMONY; FINDING MOOT DEFENDANT'S
[107] MOTION TO STRIKE; FINDING MOOT PLAINTIFF'S
[115] MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE;
AND DISMISSING PLAINTIFF'S CLAIMS WITH PREJUDICE**

THIS MATTER COMES BEFORE THE COURT on the following Motions: (1)

a Motion for Summary Judgment [81] filed by Defendant Omega Protein, Inc.; (2) a

Motion to Exclude or Limit Forensic Document Examination Report and Testimony

[89] filed by Defendant Omega Protein, Inc.; (3) a Motion to Strike [99] filed by

Plaintiff Cynthia R. Hebert; (4) a Motion to Strike [107] filed by Defendant Omega

Protein, Inc.; and (5) a Motion for Leave to File Supplemental Evidence [115] filed

by Plaintiff Cynthia R. Hebert.  These Motions are now fully briefed.  After due

consideration of the record, the submissions on file, and relevant legal authorities,

the Court finds that Plaintiff's Motion to Strike [99] should be granted in part and

is moot in part, and that Defendant's Motion for Summary Judgment [81] should be

granted.  Plaintiff's claims against Defendant should be dismissed with prejudice.

The remaining Motions [89], [107], [115] are rendered moot.

## I.  BACKGROUND

A.  Factual Background

Plaintiff Cynthia R. Hebert ["Cynthia" or "Plaintiff"] is the mother and

personal representative of Christopher Allen Hebert ["Christopher" or "Decedent"].

Compl. [1] at 1.  Before his death, Christopher was employed at Defendant Omega

Protein, Inc.'s ["Defendant" or "Omega Protein"] fish processing facility in Moss

Point, Mississippi [the "Plant"].  *Id.* at 3.  In late April 2011, Christopher contacted

Sherry Craddock ["Craddock"], a union organizer for the International Association

of Machinists and Aerospace Workers [the "Union"], and expressed an interest in

the Union representing employees at the Plant.  Dep. of Sherry L. Craddock [100-1]

at 14–19, 28–33.  Between April 20, 2011, and June 13, 2011, Christopher and

Craddock discussed organizing a union at the Plant.  Their last communication of

any sort occurred on June 13, 2011.  *Id.* at 32–46, 122–23, 147–48.  Christopher

allegedly told Craddock in May and June 2011 that he was being placed in more

dangerous jobs and being harassed by his supervisor, Wayne Gray ["Gray"], because

Christopher had spoken with other employees at the Plant about the Union and had

expressed concerns about safety at the Plant.  *Id.* at 58–61, 66–67, 73–75, 81–83,

96–97, 100–01, 108–09, 121–22.

In early May 2011, Christopher informed Craddock that he was being

harassed at work because of "being vocal regarding his concerns that the working

conditions were unsafe." Aff. of Sherry L. Craddock [100-2] at 2; *see also* Dep. of Sherry L. Craddock [100-1] at 73–75. Christopher told her that "this harassment included him being pushed into machinery, having his tires flattened on his vehicle, and having obscene messages written on the windows of his vehicle." Aff. of Sherry L. Craddock [100-2] at 2. Craddock reported that, in June 2011, Christopher showed her a body-length bruise that was at least six inches wide down the left side of his body. *Id.* at 3. Christopher told her that an Omega Protein employee had pushed him into a pole the night before "in retaliation for his desire to unionize Omega Protein." *Id.* Craddock testified in her Affidavit that in June 2011 Christopher "was scared Omega Protein was going to seriously hurt him, or kill him." *Id.* at 3–4. Craddock's Affidavit does not identify by name any Omega Protein employee who allegedly harassed or injured Christopher.

Christopher told his father, William Hebert ["William"], that Gray would place Christopher in less desirable jobs as a form of punishment for Christopher's activities at the Plant. Dep. of William Hebert [100-5] at 48–50. Cynthia, Christopher's mother, testified that Christopher informed her that Gray "was just very ugly to him" and would make Christopher "work in places he didn't want to work" in dangerous areas because Christopher was trying to unionize the Plant. Dep. of Cynthia R. Hebert [100-6] at 60–62. Towards the end of his employment at the Plant, Christopher purportedly complained to Gray that drug use was occurring in the Plant and was not being monitored by supervisory personnel. This led to a verbal altercation between Christopher and Gray. Dep. of William Hebert [100-5]

at 50–52.  Although William testified that Christopher was "scared" after the altercation, *id.*, the record is devoid of any specific information about what was said during this verbal exchange.

Gray was the night supervisor who made job assignments to all maintenance department employees, including Christopher.  Def.'s Answers to Interrogatories [100-6] at 3.  During the night shift on April 7, 2012, approximately ten months after Christopher's last communication with Craddock about unionizing the Plant, Gray assigned Christopher to perform a task near a mixing box hopper or chute [the "Hopper"] with the assistance of employee Charles Glenn Anthony ["Anthony"].  Aff. of Charles Glenn Anthony [110-4] at 2; Dep. of Wayne Gray [100-8] at 50.  While there is some dispute as to the precise task Gray assigned to Christopher and whether Christopher was actually required to work inside of the Hopper to accomplish his task, the parties do not appear to dispute that Christopher's job assignment involved working in the general vicinity of the Hopper.  *See, e.g.,* Aff. of Charles Glenn Anthony [110-4] at 2; Dep. of Wayne Gray [100-8] at 50–53, 146.

The Hopper was a metal box approximately ten feet above the ground.  Aff. of Charles Glenn Anthony [110-4] at 2.  Two different metal screws intersected at a ninety-degree angle inside the Hopper–the mixing screw and the dryer screw.[1]  Aff. of Charles Glenn Anthony [110-4] at 2; Dep. of Wayne Gray [100-8] at 50–53, 146; Aff. of LeDarrius Matthis [81-3] at 1–2.  The mixing screw was situated on the

---

[1]At times the record describes the dryer screw as the "Number 4 long screw."  *See, e.g.,* Dep. of Wayne Gray [100-8] at 77.  The mixing screw was apparently a double screw which is sometimes referred to in the plural.  For purposes of this Order, the mixing screw will be referred to in the singular.

exterior of the Plant and pushed material through a trough into the Hopper, which also sat on the exterior of the Plant. Matthis Witness Interview [100-9] at 1–2. The dryer screw pushed material from the Hopper through a trough into the drying room. *Id.* The dryer screw was located both on the exterior and the interior of the Plant, as it traversed an exterior wall of the Plant between the Hopper and the dryer room. Aff. of Alphonse Hill [81-4] at 1–2; Aff. of LeDarrius Matthis [81-3] at 1–2. Plaintiff maintains that in order to perform the task Gray had assigned Christopher, it was necessary for Christopher to stand inside the Hopper on top of the dryer screw. Pl.'s Mem. in Supp. of Resp. [101] at 6.

For safety reasons, when an employee was working on a piece of machinery at the Plant the employee was expected to lock out and tag out[2] the particular piece of machinery on the appropriate electrical control. The purpose of the lock out and tag out procedure was to advise others working in the Plant not to energize the piece of machinery, and to prevent others from energizing the piece of machinery while another employee was working on it. Controls for both the mixing screw and the dryer screw were located in the electrical control room of the Plant. According to Anthony, on April 7, 2012, Christopher locked and tagged the controls for both the mixing screw and the dryer screw, and Christopher's locks and tags were still on the controls for the mixing screw and the dryer screw when Christopher and Anthony departed work at the end of their April 7, 2012, night shift. Aff. of Charles Glenn Anthony [110-4] at 1–2.

_____

[2]The record sometimes refers to this procedure as "LOTO."

Christopher and Anthony did not complete their assigned task on April 7, 2012, and neither worked on Sunday, April 8, 2012. *Id.* at 2. When Christopher and Anthony returned to work on April 9, 2012, they resumed their assigned task. *Id.* Anthony's Affidavit does not mention whether he checked or was aware if the lock and tag were still in place on either the dryer screw or mixing screw when he and Christopher returned to work two days later on April 9. *See id.*

Also on April 9, 2012, Gray assigned LeDarrius Matthis ["Matthis"] and Alphonse Hill ["Hill"] the task of installing hangers along the length of the dryer screw inside the dryer room in order to prevent the dryer screw from contacting the bottom of its trough during operation. Aff. of Alphonse Hill [81-4] at 1; Aff. of LeDarrius Matthis [81-3] at 1–3. Prior to beginning work, Matthis locked out and tagged out the main breaker for the dryer screw. *Id.* at 2. Matthis testified in his Affidavit that his was the only lock and tag on the dryer screw at that time. *Id.*

Plaintiff testified that several of Christopher's fellow employees at the Plant informed her that the "other machine wasn't locked out, tagged out" because Omega Protein was out of locks to be used for lock out and tag out. Dep. of Cynthia R. Hebert [100-6] at 92–93. Plaintiff avers that Christopher called her at 8:10 p.m. on April 9, 2012, and told her that:

> I can't call you on my lunch tonight because I'm real busy, and he said, I've got to do some welding. He said, they don't have all the lockout/tagouts that I need, but he said, I've got to weld this particular area.

*Id.* at 93. When Plaintiff asked Christopher "why are you going to work like that," *id.* at 94, Christopher replied, "it's my job. And [Christopher] was told that he had

to work up in this area," *id*.[3]

At approximately 8:30 p.m. on April 9, 2012, Anthony left Christopher to use the bathroom. *Id*. He was intercepted by Gray who instructed Anthony to proceed to another area of the Plant. *Id*. When Anthony asked about Christopher, Gray responded "[y]ou don't worry about that. I'll take care of him. You just go where I told you to go." *Id*. at 2–3.

Matthis and Hill subsequently completed their work on the dryer screw, and Matthis sought permission from Gray to power up the dryer screw to ensure that it was not scraping its trough. *Id*. While there is some dispute as to exactly where Gray was located in the Plant at the time this conversation occurred and whether Matthis asked permission of Gray or was simply instructed by Gray to power up the dryer screw, *see, e.g.,* Resp. [100] at 4, these questions are not material. The record reflects that Gray either gave permission to or instructed Matthis to power up the dryer screw, after Matthis confirmed that "the dryer screw trough was clear and that it was safe to switch on the equipment." Aff. of LeDarrius Matthis [81-3] at 2–3. Matthis and Hill then "walked the length of the dryer screw inside the dryer room to confirm that no tools or debris had been left in the trough." *Id*. at 3. Neither Matthis nor Hill checked the Hopper or the portion of the dryer screw on the exterior of the Plant prior to energizing the dryer screw, and neither was aware that Christopher was at that point standing inside the Hopper on the dryer screw.

---

[3]Christopher's father, William, testified in his deposition that in the beginning of his employment at Omega Protein, Christopher "had problems finding out where the equipment was energized from" because "[n]one of the panels were marked, power panels." Dep. of William Hebert [100-5] at 30.

Compl. [1] at 4; Aff. of Charles Glenn Anthony [100-4] at ¶¶ 6, 13.  Matthis and Hill could not see through the wall to the exterior portion of the dryer screw or the Hopper.  Aff. of LeDarrius Matthis [81-3] at 3.  When Matthis powered up the dryer screw, he and Hill could hear someone yelling and crying for help.  *Id.*  Tragically, Christopher was caught in the dryer screw in the Hopper and died from his injuries.

Plaintiff has presented evidence through the Affidavit of Samuel Lynn Bosarge ["Bosarge"] that the Plant's tool room notebook reflected that Matthis had signed out bolt cutters from the Omega Protein tool room on the night of April 9, 2012.  Aff. of Samuel Lynn Bosarge [115-3] at 1–2.  Bosarge avers that "the most common reason to use bolt cutters was to cut off a lock on the electrical controls for the machinery at the Omega Protein Plant."  *Id.* at 2.  Bosarge claims that when he reviewed the tool room notebook again on April 15, 2012, the sign-out page for April 9, 2012, had been removed.  *Id.*[4]  Plaintiff speculates that such evidence demonstrates that Matthis and/or other Omega Protein employees may have taken "intentional steps to remove Christopher's lock, and to activate the single screw conveyor with Christopher trapped inside."  Mot. [115] at 4.

Shortly after Christopher's death, Plaintiff placed a cross at the edge of the Plant parking lot.  Dep. of Cynthia R. Hebert [100-6] at 87–88.  An unknown person

---

[4]Omega Protein has supplied its own evidence that Matthis did not check out any equipment on April 9, 2012, and that the tool list from that date was not discarded but placed in a file.  *See, e.g.,* Aff. of George Johnson [116-4] at 1–3; Tool List [116-4] at 4–5; Aff. of Johnnie Nettles [116-5] at 1–2.  Rather, both Matthis and Bosarge checked out bolt cutters on April 11, 2012.  Aff. of George Johnson [116-4] at 3; Tool List [116-4] at 4.  However, the Court construes all questions of fact in Plaintiff's favor at the summary judgment stage.

removed the cross twice. *Id.* at 88–89. Plaintiff has not submitted any evidence indicating who, if anyone, associated with Omega Protein removed the cross. Plaintiff has also testified that when she arrived home on April 17, 2013, over a year after Christopher's death and less than two weeks after this lawsuit was filed, she found flowers on the outside steps of her home. *Id.* at 138. A note was included with the flowers which read "flowers eventually die, like people do." Note [100-4] at 4. Plaintiff perceived the note as a threat. Dep. of Cynthia R. Hebert [100-6] at 143. Plaintiff has proffered the report of a "forensic document examiner," Thomas W. Vastrick, who opines in his report that "[t]o a reasonable degree of scientific certainty," Gray wrote the note included with the flowers. Report [100-14] at 1.

At the time of Christopher's death, Omega Protein carried workers' compensation insurance coverage under the provisions of the Mississippi Workers' Compensation Act, Mississippi Code §§ 71-3-1, *et seq.* ["MWCA"], through a policy with ACE American Insurance Company. Aff. of C. David Ott [81-8] at 1; Policy [81-8] at 4–27. With such coverage, an "employer's statutory responsibility to pay workers' compensation benefits become the responsibility of the [insurance] carrier." *Washington v. Tem's Junior, Inc.*, 981 So. 2d 1047, 1051 (Miss. Ct. App. 2008) (quoting *Nat'l Sur. Corp. v. Kemp*, 64 So. 2d 723, 731 (Miss. 1953)); *see also* Miss. Code § 71-3-9.

-9-

B.    Procedural History

Plaintiff filed her Complaint [1] on April 5, 2013, naming Omega Protein as a

Defendant.[5]  The Complaint essentially advances what is known as an "upside-

down compensation case."[6]  Plaintiff charges that her wrongful death claims against

Omega Protein consist of intentional torts which are not compensable under the

MWCA.  *See* Compl. [1] at 6–7; Resp. [100] at 2.  Plaintiff therefore seeks to recover

damages at law from Omega Protein.

Plaintiff asserts that Omega Protein, by and through its employees, "engaged

in intentional conduct designed to bring about injury, or death, to Christopher."

Compl. [1] at 5.  Plaintiff maintains that it was Gray's "intentional acts to harm

and/or injure Christopher" which led to his tragic death.  Pl.'s Mem. in Supp. of

Mot. for Summ. J. [101] at 1.  Plaintiff alleges that

> Gray knew Christopher was in the Hopper, because Gray instructed
> Christopher to work there.   Gray instructed Christopher's safety
> watchperson to leave Christopher unattended in the Hopper.  With full
> knowledge that Christopher was in the Hopper with the dryer screw,
> Gray instructed another Omega employee under his supervision to
> activate the dryer screw – resulting in Christopher's death.

*Id.* at 2 (emphasis in original).

Omega Protein has moved for summary judgment on Plaintiff's claims.  Mot.

---

[5]Plaintiff also named ACE American Insurance Company and ESIS, Inc., as
Defendants.  Compl. [1] at 1.  On November 15, 2013, the parties filed a Joint Stipulation of
Voluntary Dismissal Without Prejudice [55] as to ACE and ESIS.

[6]"In an 'upside-down compensation case' an employee tries to avoid compensation
coverage to escape the exclusive provisions of the workers' compensation act."  *Mathis v.
Jackson Cnty. Bd. of Supervisors*, 916 So. 2d 564, 568 (Miss. Ct. App. 2005) (citation
omitted).

for Summ. J. [81] at 1–3.  Omega Protein argues that it is immune from Plaintiff's

tort claims by virtue of the exclusive remedy provision of the MWCA.  *Id.* at 1–2

(citing Miss. Code § 71-3-9).  In turn, Plaintiff seeks to strike certain exhibits to

Omega Protein's Motion for Summary Judgment [81].  Mot. [99] at 2–7.  Omega

Protein also asks the Court to exclude or limit the forensic document examination

report and testimony from Plaintiff's proffered expert Thomas W. Vastrick, as well

as certain exhibits Plaintiff has submitted in opposition to Omega Protein's Motion

for Summary Judgment [81].  Mot. [89] at 1–3; Mot. [107] at 1–6.  Finally, Plaintiff

seeks leave to file supplemental evidence in opposition to Omega Protein's Motion

for Summary Judgment [81].  Mot. [115] at 1.

## II.  DISCUSSION

A.     Plaintiff's Motion to Strike [99]

Plaintiff asks the Court to strike four Affidavits Omega Protein attached in

support of its Motion for Summary Judgment [81], namely the Affidavits of

LeDarrius Matthis [81-3], Alphonse Hill [81-4], David Cole [81-6], and Jason Smith

[81-7].  Plaintiff argues that Matthis's, Hill's, and Cole's Affidavits are "sham"

affidavits because they are purportedly inconsistent with statements these

individuals gave the day Christopher was killed in witness interviews conducted by

or on behalf of Omega Protein as part of its investigation.  Mot. [99] at 2–6 (citing

*Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 349 (5th Cir. 2007)).  Plaintiff

seeks to strike certain portions of Smith's Affidavit pursuant to Federal Rules of

Evidence 401, 403, 602, 701–705, 801–802, and 901.[7]  *Id.* at 6–7.

Omega Protein responds that *Turner*, the case upon which Plaintiff relies, dealt with inconsistencies between averments in an affidavit and sworn deposition testimony.  Resp. [109] at 2.  Omega Protein maintains that the Affidavits may differ in certain respects from the witness interviews but are not inconsistent with them.

    1.    <u>Matthis's, Hill's, and Cole's Affidavits</u>

Federal Rule of Civil Procedure 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Rule 56 does not require that evidence presented at the summary judgment stage be in admissible form at that time, but instead provides that such material must be capable of submission in a form that would be admissible in evidence.  *Id.*

When an affidavit conflicts with prior sworn testimony, the United States Court of Appeals for the Fifth Circuit has "required an explanation of that conflict." *Copeland v. Wasserstein, Perella & Co.*, 278 F.3d 472, 482 (5th Cir. 2002) (citations omitted).  The witness statements at issue here, however, were not sworn testimony; they were an interviewer's summaries of witness interviews recorded as a "note to file."  *See, e.g.,* Matthis Witness Interview [100-9] at 1–2.  Moreover, having thoroughly reviewed Matthis's, Hill's, and Cole's Affidavits as well as their

---

[7]Plaintiff cites various Mississippi Rules of Evidence in her Motion [99].  Mot. [99] at 6.  The Court treats these as citations to the corresponding Federal Rules of Evidence.

witness interviews, the Affidavits are not inherently inconsistent with the affiants' earlier witness statements.  While some statements in the Affidavits are not identical to those appearing in the earlier witness statements, these earlier statements are not inconsistent in substance with those contained in the Affidavits, and the differences which are present do not create material questions of fact sufficient to defeat summary judgment.

The Court finds Plaintiff's other evidentiary arguments unpersuasive. Having thoroughly reviewed the Affidavits, the Court finds that all portions of the Affidavits to which Plaintiff objects constitute evidence which can be "presented in a form that would be admissible in evidence" at trial.  Fed. R. Civ. P. 56(c)(2).  The portion of Plaintiff's Motion which seeks to strike Matthis's, Hill's, and Cole's Affidavits will be denied.

> 2.   Smith's Affidavit

The Court is of the opinion that even without considering Smith's Affidavit, Omega Protein is entitled to summary judgment.  Therefore, the portion of Plaintiff's Motion which seeks to strike Smith's Affidavit is moot, and the Court will not consider Smith's Affidavit in resolving Omega Protein's Motion for Summary Judgment.

**B.**   **Omega Protein's Motions to Exclude or Limit Forensic Document Examination Report and Testimony [89] and to Strike [107], and Plaintiff's Motion for Leave to File Supplemental Evidence [115]**

Having reviewed Plaintiff's evidence which Omega Protein seeks to strike and the supplemental evidence which Plaintiff wishes to submit, the Court is of the

opinion that neither considering nor striking the proffered evidence at issue in these Motions [89], [107], [115] would change the result in this case.  Even considering all of the evidence which Plaintiff has offered and seeks to offer in resolving Omega Protein's Motion for Summary Judgment, Omega Protein is nevertheless entitled to summary judgment for the reasons that follow.  Omega Protein's Motions to Exclude or Limit Forensic Document Examination Report and Testimony [89] and to Strike [107], and Plaintiff's Motion for Leave to File Supplemental Evidence [115] need not be resolved and are therefore moot.

C.     Omega Protein's Motion for Summary Judgment

     1.     Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  If the movant meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact.  *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).  "A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quotation omitted). If the

evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  In deciding whether summary judgment is appropriate, the Court views facts and inferences in the light most favorable to the nonmoving party. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 858 (5th Cir. 2010).  Because this is a case arising under diversity jurisdiction, the Court must apply Mississippi substantive law. *Cox v. Wal-Mart Stores East, L.P.*, 755 F.3d 231, 233 (5th Cir. 2014); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

   2.   The MWCA

The MWCA provides in relevant part that

> [t]he liability of an employer to pay compensation shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next-of-kin, and anyone otherwise entitled to recover damages at common law or otherwise from such employer on account of such injury or death . . . .

Miss. Code § 71-3-9.  The MWCA defines "injury" to include

> *accidental* injury or *accidental* death arising out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner.  Untoward event includes events causing unexpected results . . . .  This definition . . . includes an injury caused by the willful act of a *third person* directed against an employee because of his employment while so employed and working on the job . . . .

Miss. Code § 71-3-3(b) (emphasis added).[8]  While not defined by the MWCA, the

---

[8]Under the MWCA, "death" means "only death resulting from such injury."  Miss. Code § 71-3-3(c).

Mississippi Supreme Court has interpreted the term "third person" to include a stranger to the employer-employee relationship or a fellow employee acting outside the course and scope of his employment. *Miller v. McRae's*, 444 So. 2d 368, 371 (Miss. 1984).

Mississippi courts have recognized an exception to the exclusivity provision of the MWCA. *See* Miss. Code § 71-3-9. If the injury is caused by the willful act of another employee while acting in the course of employment and in the furtherance of the employer's business, *see, e.g., Miller*, 444 So. 2d at 371, the MWCA "is not the exclusive remedy available to the injured party," *id.* "A mere willful or malicious act" or even "[r]eckless or grossly negligent conduct is not enough to remove a claim from the exclusivity of the MWCA." *Bowden v. Young*, 120 So. 3d 971, 976 (Miss. 2013) (quotation omitted). Rather, the act must be done with "actual intent to injure the employee, with full knowledge that the employee would be injured and with the purpose of the action being to cause injury to the employee." *Id.* In order to avoid the exclusivity provision of the MWCA in this case, then, Plaintiff must establish that another Omega Protein employee acting in the course and scope of employment and in the furtherance of Omega Protein's business, acted with intent to harm Christopher.

3.   Discussion

Omega Protein argues that the MWCA affords coverage to Plaintiff to the exclusion of Plaintiff's damages claims in this case because Christopher's death resulted from accidental injury arising out of and in the course of employment, and

not from the willful act of another employee.  Mot. [81] at 1–2.  Omega Protein

maintains that there was no actual intent to injure such that the exception to the

MWCA's exclusivity provision does not apply.  *Id.*  Even if Plaintiff could create a

genuine issue of fact as to whether a co-employee intentionally killed Christopher,

Omega Protein contends that such employee would have been acting outside the

course and scope of his employment with Omega Protein such that the MWCA

exclusivity provision would nevertheless bar Plaintiff's claims.  Mem. in Supp. of

Mot. [82] at 22–25.  Omega Protein therefore reasons that Plaintiff's claims fall

within the exclusive purview of the MWCA.

      a.    <u>Was Christopher's Injury Caused by the Willful Act of Another Omega</u>
<u>Protein Employee?</u>

Plaintiff must establish a material fact question that Matthis's and/or Gray's

actions were "done with an actual intent to injure" Christopher.  *Bowden*, 120 So.

3d at 976.  The Court recognizes that

> [w]hen state of mind is an essential element of the nonmoving party's
> claim, it is less fashionable to grant summary judgment because a party's
> state of mind is inherently a question of fact which turns on credibility.
> Credibility determinations, of course, are within the province of the
> fact-finder.
>
>                                   \*  \*  \*
>
> This is not to say that the court can never enter summary judgment when
> intent or state of mind is at issue, only that the court must recognize that
> undermining [sic] the moving party's professed state of mind is not a
> simple task.  Therefore, the court must be vigilant to draw every
> reasonable inference from the evidence in the record in a light most
> flattering to the nonmoving party.  Summary judgment, to be sure, may
> be appropriate, even in cases where elusive concepts such as motive or
> intent are at issue, if the nonmoving party rests merely upon conclusory
> allegations, improbable inferences, and unsupported speculation.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991) (quotation

omitted).

Plaintiff blames Matthis and/or Gray for causing Christopher's death. Plaintiff relies upon the fact that Matthis allegedly checked out a pair of bolt cutters from the tool room on the night of April 9, 2012, that could have been used to cut off Christopher's lock on the dryer screw,[9] and that Matthis was the person who physically energized the dryer screw which killed Christopher. *See* Aff. of Samuel Lynn Bosarge [115-3] at 1–2; Aff. of LeDarrius Matthis [81-3] at 2–3. The record is bare of any evidence tending to establish that any animosity existed between Matthis and Christopher. Plaintiff cannot withstand summary judgment on a theory that Matthis intended to injure or harm Christopher.

Plaintiff submits testimony that Christopher was allegedly harassed by Gray and placed in more dangerous jobs purportedly because Christopher had spoken with other employees at the Plant about the Union and had expressed concerns about safety at the Plant. *See, e.g.,* Dep. of Sherry L. Craddock [100-1] at 58–61, 66–67, 73–75, 81–83, 96–97, 100–01, 108–09, 121–22. However, it is undisputed that Christopher's last communication of any sort with Craddock about union activity occurred some ten months prior to April 9, 2012. Craddock acknowledged during her deposition that she had no evidence to show that Christopher was intentionally killed. Dep. of Sherry L. Craddock [100-1] at 130. Nor would the fact

---

[9]There are questions of fact as to whether Christopher locked the dryer screw, as opposed to the mixing screw alone, and whether Matthis checked out bolt cutters on the night of April 9, 2012, or two days later. The Court construes all questions of fact in Plaintiff's favor, but is of the view that these questions of fact are not material ones. *See* Fed. R. Civ. P. 56(a).

that Gray may have placed Christopher in "more dangerous jobs" in June 2011 support a reasonable inference that Gray intended to injure Christopher on the night of April 9, 2012.  Plaintiff also claims that Christopher and Gray once engaged in a verbal altercation, *see, e.g.,* Dep. of Cynthia R. Hebert [100-6] at 50–52, but no specifics about what was said during this argument have been provided to the Court.

Drawing every reasonable inference in the record in a light most flattering to Plaintiff, Plaintiff's theory of the case would require a jury to accept a series of conclusory allegations, improbable inferences, and unsupported speculation in order to return a verdict for Plaintiff.  This is insufficient to create a question of fact that Matthis, Gray, or any other Omega Protein employee acted "with an actual intent to injure" Christopher.  *Bowden*, 120 So. 3d at 976; *see also Int'l Shortstop*, 939 F.2d at 1265.  Plaintiff has not identified by name any other Omega Protein employee whom she believes intended to harm Christopher.  In sum, there is insufficient evidence in the record for a jury to reasonably infer that any Omega Protein employee acted with an actual intent to injure Christopher.

Reviewing the evidence in a light most flattering to Plaintiff, the record supports the conclusion that, at worst, Christopher's fellow employees acted recklessly and with negligence, if not gross negligence, leading to Christopher's tragic, untimely death.  "Reckless or grossly negligent conduct is not enough to remove a claim from the exclusivity of the Act." *Blailock v. O'Bannon*, 795 So. 2d 533, 535 (Miss. 2001).  Tragic though the circumstances of this case are, the

evidence presented is insufficient to escape the exclusivity of the MWCA.  *See*

*Bowden*, 120 So. 3d at 976.

> b.  <u>Even Assuming Christopher's Injury was Caused by the Willful Act of
> Another Employee, His Injury is Nevertheless Compensable Under the
> Exclusive Remedy Provision of the MWCA</u>

Even if the Court were to accept Plaintiff's argument that an Omega Protein

employee intentionally harmed Christopher because of his union activities,

summary judgment in Omega Protein's favor would nevertheless remain

appropriate.[10]  Under such a scenario, Christopher's death would remain a

compensable "injury" under the MWCA and therefore subject to the MWCA's

exclusivity provision.

> (1)  *Whether Christopher's Injury was Caused by the Willful Act of a "Third
> Person"*[11]

The MWCA affords coverage for "injury caused by the willful act of a third

person directed against an employee because of his employment while so employed

and working on the job . . . ."  Miss. Code § 71-3-3(b).  Accepting as true Plaintiff's

theory that an Omega Protein employee intentionally harmed Christopher, in order

to escape the exclusivity of the MWCA the employee would have to have been acting

in the course and scope of his employment with Omega Protein and in the

furtherance of Omega Protein's business at the time the employee intentionally

killed Christopher.  *See* Miss. Code § 71-3-3(b).

---

[10]Plaintiff has not named Matthis, Gray, or any other employee as an individual
Defendant in this action.

[11]Miss. Code § 71-3-3(b).

In evaluating whether an employee has acted within or outside the course and scope of his employment for purposes of Mississippi Code § 71-3-3(b), courts applying Mississippi law look to whether the facts would support respondeat superior tort liability.  *See, e.g., Tanks v. Lockheed Martin Corp.*, 417 F.3d 456, 464 (5th Cir. 2005).

> The Mississippi Supreme Court defines actions taken in the "course and scope" of employment with respect to respondeat superior tort liability as acts "committed in the course of and as a means to accomplishing the purposes of the employment and therefore in furtherance of the master's business . . . [or] tortious acts incidental to the authorized conduct."  An employee's unauthorized acts may yet be within the course and scope of employment if they are of the "same general nature as the conduct authorized or incidental to that conduct."  *An intentional violent assault on a co-worker is quite obviously neither committed as a means of accomplishing the purposes of the employment nor of the same general nature as authorized conduct.*

*Id.* (quoting *Adams v. Cinemark U.S.A., Inc.*, 831 So. 2d 1156, 1159 (Miss. 2002)) (emphasis added).

To escape the exclusivity of the MWCA, Plaintiff would have to show an Omega Protein employee intended to harm Plaintiff and that the employee acted within the course and scope of his employment and in furtherance of Omega Protein's business.  An intentional killing of Christopher by Matthis, Gray, or any other employee would not have been a means to accomplishing the purposes of employment with Omega Protein and would not be in furtherance of Omega Protein's business.  *See id.*  Nor would any such tortious act qualify as incidental to authorized conduct.  *See id.*  Such behavior would constitute the independent conduct of a third person acting outside the course and scope of his employment, which is the limited type of non-accidental injury covered by the MWCA.  *See id.*;

*see also* Miss. Code § 71-3-3(b).

> (2)   *Whether Christopher's Injury was "Because of His Employment While So Employed and Working on the Job"*[12]

If an Omega Protein employee intentionally harmed Christopher because of his union activities or complaints about safety at the Plant, Christopher's injury would still be a compensable "injury" under the MWCA.  The MWCA covers an employee's injuries incurred as the result of a willful act of a third party which are "directed against [the] employee because of his employment while so employed and working on the job . . . ."  Miss. Code § 71-3-3(b); *see also, e.g., Total Transp, Inc. of Miss. v. Shores*, 968 So. 2d 400, 406–08 (Miss. 2007).  If Plaintiff's version of events is accepted as true, this would indicate that any malicious and intentional acts of Christopher's fellow employees, while not in furtherance of Omega Protein's business, were inflicted by such employees "because of" Christopher's employment while Christopher was employed and working on the job at the Plant.  *See* Miss. Code § 71-3-3(b); *see also, e.g.,* Pl.'s Mem. in Supp. of Resp. [101] at 3–5 (speculating as to motive and detailing Christopher's unionization efforts at the Plant).  In sum, even assuming that Matthis's, Gray's, or another employee's actions in injuring Christopher were intentional, Omega Protein has demonstrated that the MWCA nevertheless applies.  *See* Miss. Code § 71-3-3(b).  Under Mississippi law, when there is coverage under the MWCA, workers' compensation is the employee's or the employee's family's exclusive remedy against his employer.  Miss. Code § 71-3-9.

---

[12]Miss. Code § 71-3-3(b).

The facts of this case are tragic.  However, even viewing all facts and inferences in the light most favorable to Plaintiff as the nonmoving party, Plaintiff's claims fall within the scope of the MWCA.  Plaintiff's claims against Omega Protein, which relate to Christopher's on-the-job death at the Plant, must be addressed through the workers' compensation system, and in Mississippi that system provides the exclusive remedy for an injured employee and "his legal representative, . . . parents . . . , and anyone otherwise entitled to recover damages at common law or otherwise from such employer on account of such injury or death . . . ."  Miss. Code § 71-3-9.  The MWCA is Plaintiff's exclusive remedy, and Omega Protein is entitled to judgment as a matter of law on Plaintiff's claims against Omega Protein in this case.

III.  <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that Plaintiff's Motion to Strike [99] should be granted in part and found moot in part, and that Defendant's Motion for Summary Judgment [81] should be granted.  The remaining Motions [89], [107], [115] are moot.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Motion to Strike [99] filed by Plaintiff Cynthia R. Hebert is **DENIED IN PART and MOOT IN PART**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the Motion for Summary Judgment [81] filed by Defendant Omega Protein, Inc., is **GRANTED**, and Plaintiff's claims against Defendant Omega Protein, Inc., are **DISMISSED**

**WITH PREJUDICE**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the Motion to Exclude or Limit Forensic Document Examination Report and Testimony [89] filed by Defendant Omega Protein, Inc., the Motion to Strike [107] filed by Defendant Omega Protein, Inc., and the Motion for Leave to File Supplemental Evidence [115] filed by Plaintiff Cynthia R. Hebert are all **MOOT**.

**SO ORDERED AND ADJUDGED**, this the 8th day of September, 2014.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

-24-